# SUPREME COURT,

## STATE OF KANSAS.

# JANUARY TERM, 1892.

PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, ⎫ Associate Justices.
Hon. WILLIAM A. JOHNSTON, ⎭

## The State of Kansas v. David E. Davis.

1.* Murder — *Conviction — Evidence Sustains Judgment.* The evidence examined, and *held,* that the supreme court cannot say that there was not sufficient evidence to sustain the verdict of the jury and the judgment of the trial court in convicting and sentencing the defendant for the offense of murder in the first degree.

2. Corpus Delicti — *Evidence.* In a criminal prosecution for murder in the first degree, where the *corpus delicti* cannot well be proved except by the introduction of evidence tending to show the defendant's guilty 'connection with the offense, *held,* that evidence tending to prove both the *corpus delicti* and the defendant's guilt may be introduced at the same time.

3. ——— *Separation of Witnesses.* In such prosecution, where the defendant requests a separation of the witnesses, but no special reasons are given, the supreme court cannot say that the trial court so abused its discretion as to commit material error by its refusal to grant the defendant's request.

4. ——— *Taking Jury from Court-Room.* In such prosecution, where the defendant demurred to the evidence of the prosecution, and requested that the jury should be removed from the court-room during the argument of counsel, and it does not appear that anything was

1—48 KAS

said in the argument of counsel or at any time by the court preju-
dicial to the substantial rights of the defendant, and it is shown af-
firmatively that the court in overruling the demurrer did not make
any comment or give any reason for its ruling, *held*, that no mate-
rial error is shown.

5. INSTRUCTIONS — *Reasonable Doubt.* In such prosecution, where the
trial court instructs the jury sufficiently with respect to all reasona-
ble doubts which the jury might entertain with regard to the defend-
ant's guilt, but does not define or by any other words explain the
meaning of the words "reasonable doubt," *held*, that such failure to
define or explain the meaning of such words is not error.

6. INSTRUCTIONS, *Not Signed by Judge.* In such prosecution, the trial
judge did not sign the instructions, nor give the paper containing
them to the jury; but the paper was handed to the clerk, and became
a part of the files of the court, and no one requested that the instruc-
tions should be signed, or that the paper containing them should be
given to the jury. *Held*, That no material error was committed.

*Appeal from Leavenworth District Court.*

PROSECUTION for murder in the first degree. Verdict of
guilty, and judgment thereon. Defendant, *Davis*, appeals.
The opinion states the facts.

*Thomas P. Fenlon, C. F. W. Dassler,* and *James W. Co-
burn,* for appellant.

*John H. Atwood,* county attorney, for The State; *Lucien
Baker,* of counsel.

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution in the
district court of Leavenworth county, upon information charg-
ing the defendant, David E. Davis, with committing murder
in the first degree, in killing his wife, Matilda Davis, on Octo-
ber 9, 1890. The information charges, among other things,
as follows:

"And the said David E. Davis, with a certain pillow, and
a certain substance the exact character of which is to said
county attorney unknown, which he, the said David E. Davis,
in his hand then and there had and held, did unlawfully,
feloniously, willfully, deliberately, premeditatedly, and with
malice aforethought, and with the intent then and there to

kill the said Matilda Davis, choke, smother, cover the mouth and nose of and stop the breathing of the said Matilda Davis for a long time, to wit, 15 minutes; and the said David E. Davis, with a certain instrument, the precise nature of which is to said county attorney unknown, did unlawfully, feloniously, willfully, deliberately, premeditatedly, and with malice aforethought, and with the intent then and there to kill the said Matilda Davis, assault, beat, strike, bruise and wound the body of the said Matilda Davis, inflicting then and there in and upon the body of the said Matilda Davis certain mortal wounds, from all of which, the choking, smothering, covering the face of and stopping the breathing of the said Matilda Davis, and the assaulting, beating, striking, bruising, and wounding, as aforesaid, and the wounds aforesaid, she, the said Matilda Davis, then and there died."

A trial was had before the court and a jury from January 26 to January 31, 1891, and the defendant was found guilty of murder in the first degree, and was sentenced accordingly on April 4, 1891; and he now appeals to this court. The principal ground upon which a reversal is asked is, that the verdict and sentence in the court below are not supported by sufficient evidence. It is claimed that the defendant not only did not have any connection with the offense charged in the information, but that no such offense was ever in fact committed by any person. It is admitted, however, that Mrs. Davis died on the night of October 8 and 9, 1890, shortly after 12 o'clock; but it is claimed by the defendant that her death resulted from natural causes, and not from any wrongful act or acts on the part of any person; and that whatever may have been the causes of her death, the defendant had no connection with them. The evidence, however, seems to have been sufficient to satisfy the court below and the jury beyond all reasonable doubt that her death was caused by the deliberate, premeditated and felonious acts of her husband, the defendant, Davis; and there certainly was some evidence from which the court below and the jury might have found such facts. The theory of the prosecution is, that the deceased died from asphyxia, suffocation, smothering, produced by the external application of something in the hands of the defend-

ant, Davis. On the other side, the defense claims that if Mrs. Davis did die from asphyxia, which is not admitted, it was produced principally by internal disease, aggravated, possibly, by fright from fire in the room and from smoke. Taking the evidence of the physicians, and it is proved almost conclusively that she died from asphyxia, and the question then arises, how was this produced? Was it caused by the wrongful acts of the defendant, Davis, or was it caused by internal disease and fright and smoke?

We shall now pass to another ground urged for reversal and consider the two grounds together. Such other ground is that the court below, before it was sufficiently shown by the evidence or otherwise that any offense at all was committed, or, in other words, before sufficient evidence was introduced to prove the *corpus delicti*, erroneously permitted the prosecution to introduce evidence tending to show that the defendant may have been guilty of the supposed offense; that he entertained hostile feelings toward the deceased; that he had previously used personal violence toward her, and made threats of killing her, and that he had strong personal and pecuniary motives for desiring and causing her death. We do not think that any such error was committed; for although the court permitted evidence to be introduced as is claimed, yet all the evidence of the defendant's supposed guilt was introduced along with the other evidence for the purpose not only of showing that he was in fact guilty, but also of showing that the offense was really and in fact committed by some person, or, in other words, of proving the *corpus delicti*. In a case like this, it would be almost if not utterly impossible to prove the *corpus delicti* without at the same time or previously introducing evidence tending to show that it was the defendant who was the principal if not the sole actor in committing the offense. Under the circumstances of this case, it was absolutely necessary either to prove both the *corpus delicti* and the defendant's connection with the offense at the same time, or else to utterly abandon all proof, for one could not at all be proved without proving the other. Was the *corpus delicti*

proved? Or, as the question is presented to this court, was there sufficient evidence introduced to sustain the decision of the court below and the jury that it was proved?

As before stated, we think it was shown beyond all question that Mrs. Davis died from asphyxia. Then, was this asphyxia brought about by the acts of the defendant, Davis, in suffocating or smothering her, or did it originate from internal disease, and from fright and smoke, as contended by the defendant? Mrs. Davis, up to the time when she went to bed, about 10 o'clock in the evening of October 8, 1890, was in apparently good health. She was over 70 years old, however, and from the *post mortem* examination it was found that she had a diseased kidney. Her other kidney and lungs were also slightly diseased, and she also had bruises about her arms and face. When she was first found after her death she was lying on her back, her hands thrown back and open and palms upward, and she was limber, and her lower jaw dropped down. Her bedroom was on the first floor of the house, and connected by an open door with the sitting-room, and one of the sitting-room windows was open to the outside of the house. The defendant Davis's bedroom was upstairs. The next morning it was found that there were tracks of some person on the ground outside of the house going up to that window, into which tracks Davis's shoe fitted exactly. Harry Crook, a grandson of the deceased, about 15 years old, slept in the same room with the deceased, on a feather tick on the floor. Before going to bed he had been reading, but on retiring he put the lamp on the bureau, extinguished the light, and went to bed and to sleep. Some time during the night he heard, or dreamed he heard, his grandmother calling to him, "Harry, Harry! help, help!" Afterward, he also heard, or dreamed he heard, some one going upstairs, and then some one walking over the sitting-room floor, and the boards creaking. Davis's room was over the sitting-room, and he was the only person who slept upstairs. Afterward, Harry Crook became completely aroused from his slumbers, and got up and called Charles Morton and his wife, who slept in a back room of

the house on the first floor. At this time there was a small fire on the floor near the middle of Mrs. Davis's sleeping room, which fire, before it was extinguished, increased in extent. The lamp, also, which had been left on the bureau, was down on the floor, and the bowl broken, the burner "unscrewed" from the bowl, and the chimney not broken. When Morton first came into the deceased's room he called, "Grandma, grandma!" but she made no answer, and he found that she was dead. She was lying on her back, her hands thrown back, palms up and open. About that time the defendant, Davis, came down-stairs in his night-gown and socks. No one at that time, except Morton and the murderer, if a murder was committed, knew that Mrs. Davis was dead, yet, nevertheless, according to Morton's testimony, Davis, when he got to the sitting-room door and in the hall, exclaimed, "My wife is dead!" and pretended to cry, but did not; and shortly afterward Davis inquired where Mrs. Davis kept her money, and he looked into a bureau drawer and found a tin box and looked into it.

At some time prior to the commencement of the divorce suit, and while Davis and his wife were living together, she executed a will in his favor, but when she commenced the divorce suit she destroyed the will. Also, at the time when Harry Crook went to bed the little dog was in the sitting-room, and the door leading from this room into the hall was so locked that it could be opened from the inside, but not from the hall. After the alarm, and when this door was opened, the little dog was found in the hall, and not in Mrs. Davis's bedroom, nor in the sitting-room. And this dog was in the habit of following Davis. Davis's bed upstairs did not show any signs of any person having lain down upon it or in it, but it appeared as though some person had simply sat down upon its side. The prosecution also introduced evidence tending to show that Davis had strong pecuniary and personal motives for taking the life of Mrs. Davis. They had been married nearly eight years. He had previously been a convict in the penitentiary for horse stealing, and at the time of the marriage and after-

ward had but little property, while she was worth about $7,000. During their married life they had frequent quarrels and bickerings, and he had several times used violence toward her, had struck her, and choked her, and had threatened to kill her. Finally she commenced an action in the district court to procure a divorce, and the trial of this divorce action was set for October 11, 1890. Only about three days before the death of the deceased, and only six days before the time fixed for the trial of the divorce suit, the defendant, in conversations about the divorce suit with Joseph Keenan and his wife, Eliza Keenan, threatened in substance that he would kill both the old lady (Mrs. Davis) and Harry Crook, the grandson; and stated to Mrs. Keenan that there would be nobody living to enjoy the property. Mrs. Keenan had at the time been subpœnaed as a witness in the divorce case, but Davis told her that she would never go or be called into court, and also stated that Mrs. Davis would never die a widow.

The theory of the prosecution in this case is, that if Davis went upstairs to his room on the night of October 8, 1890, at about 10:30 o'clock, as he claims he did, then that afterward, and about midnight, he came down-stairs, went out of the house at the front door, and in any case, he was outside of the house, and went around to the open sitting-room window, climbed into the sitting-room through the window, went through the sitting-room to Mrs. Davis's sleeping room, and then smothered her with a pillow or with something else equally effective, and then passed out through the sitting-room and sitting-room door, and into the hall and upstairs to his room. There is no direct evidence to prove this. It is all circumstantial; but the court below and the jury believed it to be sufficient. The evidence of the defense presents some seeming explanations to some of the inculpatory evidence introduced on the part of the state. The defendant in fact, who was a witness for himself on the trial, denied and contradicted almost everything that would seemingly tend to criminate him. He testified that he never struck or choked his wife or offered her any violence; that he never threatened her life or Harry Crook's life, nor

even intended any such thing; that he was not in fact in her
bedroom during the night of October 8 and 9, 1890; that he
did not suffocate or smother her, nor even touch her that
night; and that the little dog was not in her room at all that
night, but went upstairs with him about 10:30 o'clock, and
remained there near his door until the alarm was given, after
12 o'clock. Also, three physicians who made a *post mortem*
examination made a written statement that "Mrs. Davis was
laboring under a disease from which she was liable to die at
any time suddenly." It is probable that they did not mean
to use the words "liable to" in the sense of "likely to." Two
of such physicians testified on the trial that they did not mean
that it was probable, but only that it was possible for Mrs.
Davis to die suddenly from such disease; and, taking the en-
tire testimony of all the physicians who testified in the case,
and considering it in connection with the other evidence in
the case, it would seem that it was not at all probable and
scarcely possible that Mrs. Davis did in fact die from natural
causes; and the questions as to the causes of her death, and as
to the defendant's guilt or innocence, were under the evidence
questions of fact, primarily for the jury and then for the trial
court. And while the evidence which tends to show that
Mrs. Davis was murdered, and that Davis was responsible for
it, is not as conclusive or as convincing as it
might be, yet we cannot say that the court below
and the jury erred in finding these facts. Nor
can we say under the facts of this case that the court below
erred in permitting evidence to be introduced tending to prove
the defendant's guilty connection with the offense before the
*corpus delicti* was sufficiently proved. Under the facts of
this case, we think the court had the right to permit the evi-
dence tending to show the *corpus delicti* and the defendant's
guilty connection with the offense to be introduced
at the same time, as the two kinds of evidence
could not well be separated. We think a trial
court in any case, civil or criminal, has a wide discretion in
determining the order for the introduction of a party's evi-

1. Evidence sus-
tains judg-
ment.

2. Corpus delicti;
defendant's
guilt; evi-
dence.

dence.  A trial court will generally adopt the most convenient order for the introduction of evidence, the one that will most facilitate the business of the trial, and at the same time will least embarrass the parties, and will in the end be the most likely to bring about substantial justice.

It is claimed by the defendant that the court below erred at' the beginning of -the trial in refusing the request of the defendant to separate the witnesses.  Such request will generally be granted by a trial court, and yet the matter rests almost wholly within the sound judicial discretion of such court.  The trial court in the present case exercised its discretion, and we cannot say that it abused its discretion; and therefore we cannot say that it committed any material error by its refusal.  No special reasons were given why the witnesses should be separated.

3. Separation of witnesses.

It is further claimed that the court below erred in permitting the jury to remain in the court-room during the argument of counsel upon the defendant's demurrer to the evidence of the prosecution.  It is not shown that anything was said in the argument by counsel, or at any time by the court, prejudicial to the substantial rights of the defendant, and it is shown affirmatively that the court in overruling the demurrer did not make any comment, or give any reasons for its ruling.  Therefore no error is shown in this regard.

4. Taking jury from court-room.

It is claimed that the court below erred in refusing to give the instructions asked to be given by the defendant.  Now, many of these might have been given without the commission of any error, and the substance of many of them was in fact given by the court.  Some of them, however, could not have been given without the commission of error as against the state. As sufficient and proper instructions were given, we do not think that any substantial error was committed in refusing the defendant's instructions.

But it is claimed that sufficient instructions were not given. For instance, it is claimed that the court below erred in not

The State v. Davis.

defining the words "reasonable doubt."  The court instructed the jury, among other things, as follows:

"You are to presume the defendant to be innocent until his guilt shall be established by the evidence, to your satisfaction, beyond a reasonable doubt.  Attempts have often been made by judges to define the phrase 'reasonable doubt,' as used in criminal proceedings, but with doubtful success, inasmuch as the words themselves are as simple and as generally understood as any others the language affords.  In some cases which have come under my observation, where the judge attempted to elucidate these terms by a multiplication of words, some of them have been seized upon as catch-words to wrench the phrase from the meaning it conveys to the mind of every juror fit to participate in the administration of the law. Hence, I content myself with the use of the words the statute employs, believing you to be equal to their full comprehension. This presumption of innocence must attend the defendant through all the stages of this trial.  .  .  .  Under this information, the defendant may, if the testimony warrants it, be lawfully convicted of either of the degrees of murder.  If you shall have a reasonable doubt of which of two degrees of a crime the defendant was guilty, if guilty of any, it will be your duty to convict him, if at all, of the lesser degree.  If, in considering the testimony of this case, you should come to the conclusion that it is wholly circumstantial, including the testimony of no witness who testified to having seen the defendant do any act of violence tending to produce the death of his wife, it would nevertheless be your duty to find him guilty, if from all the evidence you are satisfied beyond a reasonable doubt of his guilt.  But if, considering all the circumstances surrounding the death of the deceased, as detailed in the evidence, you have a reasonable doubt as to whether she came to her death from natural infirmity or disease in her system, or from any cause other than violence from the defendant, it will be your duty to give the defendant the benefit of such doubt, and acquit him.  A few facts or a multitude of facts, proven or consistent with the supposition of guilt, are not enough to warrant a verdict of guilty.  In order to convict on circumstantial evidence, not only the circumstances must all concur to show that the defendant committed the crime, but they must all be inconsistent with any other rational conclusion."

It is to be presumed that the jury understood what the

words "reasonable doubt" meant. The idea intended to be expressed by these words can scarcely be expressed so truly or so clearly by any other words in the English language. And generally the attempted definitions of them by courts or others are simply misleading and confusing, and not proper explanations of their meaning at all. There are definitions or paraphrases of these words, however, which have been held to be good by the courts, but even they are scarcely as good as the words themselves. We do not think that the court below committed any material error in refusing to define these words.

5. Reasonable doubt; instruction.

It is also claimed that the court below erred in not signing the instructions given by the court to the jury, and in not giving the paper containing them to the jury so that the jury could take them to their room. The instructions were really given to the clerk, and are retained by him among the files of the court. Now it does not appear that either the defendant or his counsel or the jury or anyone else requested the court to give the paper containing these instructions to the jury, or that the jury should be permitted to take them to their room for the purpose of consulting them during their deliberations; hence, how can it be said that the defendant was prejudiced because of the fact that the court below, or rather the judge, did not sign the instructions? (*The State v. Buffington,* 20 Kas. 599.) And certainly it cannot be said that the court below erred in not giving the paper containing them to the jury when no one requested any such thing. The defendant, however, seems to think that the trial court should have done whatever he thinks it ought to have done, without any request. Sometimes a trial court is required to do some particular thing without a request, but this is not one of such things. The criminal code with respect to charging the jury reads as follows:

6. Instructions not signed by judge.

"SEC. 236. The judge must charge the jury in writing, and the charge shall be filed among the papers of the case. In charging the jury, he must state to them all matters of law which are necessary for their information in giving their verdict. If he presents the facts of the case, he must inform

the jury that they are the exclusive judges of all questions of fact."

This section says nothing about the judge signing the instructions or giving the paper containing them to the jury, although perhaps ordinarily such would be his duty. From the record in this case, we would think that the court in charging the jury complied literally with the foregoing section. The charge seems to be in writing. The judge stated to the jury that they were the exclusive judges of all questions of fact, and he charged them with respect to all matters of law which were necessary for their information in giving their verdict.

We think no material error of law was committed during the trial, nor indeed at any time; and as to the questions whether the offense was *in fact* committed, and whether the defendant was *in fact* the guilty perpetrator, which under the evidence are pure questions of fact, the court below and the jury before whom the case was tried, who saw all the witnesses and the defendant and heard them all testify, and who seem to have been satisfied beyond all reasonable doubt that the defendant was guilty, had much better means of determining these questions than we have, who know nothing about the case except as we obtain our information from the record.

The judgment of the court below will be affirmed.

All the Justices concurring.