Wanamaker, J.
Realizing the great importance of the questions arising in this case, both to the public for its safety of life and limb in the public streets and highways and to automobilists as to their rights in the use of the public streets and highways, unusual care and consideration has been given this case and the law applicable thereto.
Now, what are the facts of this case so far as necessary for its intelligent and just determination?
The state claimed that on the second day of August, 1915, in broad daylight, at about 5:30 p. m., the defendant in error, E. E. Schaeffer, was driving a touring car at from twenty-five to thirty miles an hour in a southerly direction, on the left side of one of the principal streets, known as High street, in the village of Fairport, having a population of about 3,000, and that he then and there and thereby ran over and fatally injured Adelbert Chaky, “sometimes otherwise known as Buley Csaki,” a boy less than three years of age; that this was a thickly-settled community and that a large number of children were accustomed to play on this part of the street and were so playing at the time of the killing; and that said children were then and there seen, and were admitted to be seen, by the defendant.
The state further claimed that such high and *218 dangerous rate of speed of said car was in violation of Section 12603, General Code, which reads:
“Whoever operates a motor vehicle or motorcycle on the public roads or highways at a speed greater than is reasonable or proper, having regard for width, traffic, use and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person, shall be fined not more than twenty-five dollars,” etc.
And also in violation of Section 12604, which reads:
“Whoever operates a motor cycle or motor vehicle at a greater speed than eight miles an hour in the business and closely built-up portions of a municipality or more than fifteen miles an hour in other portions thereof ór more than twenty miles an hour outside of a municipality, shall be fined,” etc.
The defendant denied the rate of speed charged by the state and claimed to have been driving his automobile at only eight miles per hour at the time named.
At the close of the state’s evidence the defendant moved the court to require the state to elect under which statute, to-wit, Section 12603 or Section 12604, it would rely for conviction. The state objected to the election. The court overruled the objection. Thereupon the state elected to proceed under Section 12603.
While this question was not before the court of appeals, the state having secured a judgment in the court of common pleas in its favor notwithstanding this ruling of the trial judge, we deem it *219 of sufficient importance to the criminal jurisprudence of the state, and to the public interest as well, to review this ruling.
The fair trial guaranteed by the constitution and law of the land requires that it be fair; not only to the defendant, but fair likewise to the plaintiff, the state, the people of Ohio.
The matter of election has been before this court so often that it would seem there should be no doubt as to the rights of parties under a long-established rule of criminal procedure.
One of the earliest cases is that of Bailey v. The State of Ohio, 4 Ohio St., 441. It is doubtful if the supreme court of Ohio was ever more distinguished for its legal learning and logic than at that time, when it was composed of Chief Justice Allen G. Thurman and Associate Justices Rufus P. Ranney, Thomas W. Bartley, Joseph R. Swan and William Kennon.
In the opinion of that case, in which all concurred, the following is pertinent:
“When an indictment charges two or more distinct offenses, differing in their nature, or arising out of distinct and different transactions, the court may compel the prosecutor to elect upon which charge he will proceed. But such election will not be required to be made, where the several charges in the indictment relate to the same transaction, or are simply variations or modifications of the same charge, with a view of meeting the proof.”
Manifestly there was but one transaction before the court in the case at bar. There was but one offense charged, and that was manslaughter; and *220 there was also only one unlawful act, though one statute may have designated it in one form and another statute may have designated it in another.
We hold that, under the conceded facts of this case and the' settled rule of criminal procedure in Ohio, it was error against the state to require the prosecutor to elect.
This same doctrine is approved and followed with reference to the manner in which a single offense is charged in Jackson v. The State, 39 Ohio St., 37; State v. Bailey, 50 Ohio St., 636, and Carey v. The State of Ohio, 70 Ohio St., 121.
The errors complained of before the court of appeals, and which are here for review, may be briefly stated as follows:
1. That the indictment did not set out facts sufficient to constitute a charge of manslaughter.
2. Error in the cross-examination of the defendant.
3. A fatal variance between the charge in the indictment and the evidence in the case, the indictment charging that the defendant killed “Adelbert Chaky, sometimes otherwise known as Buley Csaki;” that the evidence tended to show that defendant killed Adelbert Chaky, yet there was no evidence to prove that the boy was sometimes known as Csaki; and that therefore the case of Goodlove v. The State of Ohio, as found in 82 Ohio St., 365, requires reversal.
4. Error in failing to give defendant’s request as to the charge of assault and battery.
5. That Section 12603, upon which the state solely relied after election for the necessary “un *221 lawful act,” is unconstitutional and void for the reason that it is too indefinite and uncertain in its terms; that it violates the constitutional guáranty to the accused to sufficiently advise him of the nature of the accusation against him.
6. That if such statute (12603) is a valid statute, the court failed to properly charge as to the terms of the statute with reference to “what would be a reasonable and proper operation of an automobile under the conditions of the particular case.”
7. That the court erred in its charge to the jury in failing to state that any unlawful speed of the car, if there was such unlawful speed, must be the direct and proximate cause of the death of the child.
Now as to the first assignment of error, to-wit, that the indictment did not set out facts sufficient to constitute a charge of manslaughter, the indictment upon which the defendant in error was tried, with the formal parts omitted, reads: “That E. E. Schaeffer did unlawfully kill Adelbert Chaky, sometimes otherwise known as Buley Csaki, then and there being,” etc.
In short, it was an indictment for manslaughter charged in the short form, as provided in Section 13583, General Code. This is the form that has long been in use in Ohio, and has been approved repeatedly by this court as sufficiently charging the offense of manslaughter.
Manslaughter, as known in Ohio, is defined as follows: “That if any person shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the *222 commission of some unlawful act, every such person shall be deemed guilty of manslaughter,” etc. (33 O. L., 33; 1 S. & C., 403.)
This is the old form of the statute, prior to revision and codification, and has been approved by this court as a correct definition of manslaughter under the present statute. Johnson v. State of Ohio, 66 Ohio St., 59, 63.
It was further held in the Johnson case, that the unlawful act must be one prohibited by the statute of Ohio.
The court of appeals rightfully held the indictment good.
We come now to the second ground of error, touching the cross-examination of the defendant.
The defendant had denied all knowledge of having struck the boy, and testified that he knew nothing about it until he returned home.
He was then asked: “Did you at any time go up there to find out what was claimed or what you were accused of?” His answer was, “No, sir.”
Several questions of like character were asked.
It has always been held admissible to show the conduct of the accused immediately after the time he is charged with having committed an offense, for the purpose of showing innocent or guilty conduct, as the case may be.
There was no error in this line of cross-examination, and the court of appeals so held.
The third error complained of is a variance between the charge in the indictment as to the party killed and the proof upon the trial. The indict *223 ment averred the person killed as “Adelbert Chaky, sometimes otherwise known as Buley Csaki.”
The evidence shows that the dead child was named Adelbert Chaky, but there was no evidence touching the fact that he was “sometimes otherwise known as Buley Csaki,” and it is therefore claimed that under authority of Goodlove v. The State of Ohio, 82 Ohio St., 365, there was a fatal variance and that the judgment should be reversed.
It is difficult to see any substantial distinction in principle between this claim of error and the claim of error in the Goodlove case. True, in the Good-love case the first name was unproved by any testimony, and in this case the second name is unproved by any testimony, and in each case there is no evidence whatsoever to prove that both names were names of one and the same person.
The purpose of pleading an alias is to further advise the defendant of the identity of the person killed, to advise him that such person was known by different names, and to qualify the testimony of the different witnesses who may have known him under these differing names. In no case is a mere alias a matter of such necessary and indispensable description that failure to prove the same should be considered by a court of justice as prejudicial to the substantial merits of the case. In this respect the case of Goodlove v. The State of Ohio, supra, is disapproved.
The next error complained of, number 4, was the refusal to give defendant’s request as to assault and battery.
It is a well-settled rule of our law, applicable as *224 well to civil as to criminal causes, that the charge of the court shall be confined to the material issues of each given case. It is as much error to fail to charge upon an issue of fact in the case as it is to charge upon some issue of fact not in the case. In either event it is a question for the courts to determine whether or not such error is prejudicial to the substantial rights of either party to the case.
In the case at bar there was no question but that the killing of the child was the natural and direct result of the car striking the child. The overwhelming evidence is. clear, convincing and conclusive as to that fact. There is not even a suggestion or suspicion to the contrary. It would have been in that event absolutely absurd for the court to charge upon the question of assault and battery, because that issue was in no wise raised in the case.
If the defendant was, at the time of the killing of the child, engaged in the commission of an unlawful act, one prohibited by the Ohio statute, and death directly resulted from such act, the offense was manslaughter; nothing more and nothing less. If he was not engaged in the commission of such unlawful act, then, whether death did or did not result, there was neither manslaughter nor assault and battery. No crime against any statute had been committed. • True, in cases of aggravated assault, such as assault with intent to rob, to rape, to kill, and the like, simple assault or assault and battery are generally included offenses for which conviction may be had; and this is true ofttimes in homicide where the evidence would warrant a charge as to assault, or assault and battery, but *225 the evidence in the case must be such as to raise such an issue. In short, if the death may or may not have directly resulted from the assault or the assault and battery, it is a question to be submitted to the jury as to whether or not death was the proximate result of the assault or assault and battery. But where there is no such issue, it is manifest mockery of the rights of the state and of the cause of justice to inject this issue, and, in a clear case of murder in the first or second degree, or any homicide, furnish the jury with an inducement and an invitation to bring about a miscarriage of justice by the easy route of assault and battery.
We are not without previous authorities to sustain this holding. One of the oldest and best considered cases upon this subject is Marts v. The State, 26 Ohio St., 162. This was a case of manslaughter, in which the defendant interposed self-defense. The fourth paragraph of the syllabus reads:
“4. On the trial of an indictment for murder it is competent for the jury, where the evidence justifies it, to find the defendant guilty of an assault and battery only, and it is error to the prejudice of the defendant to instruct the jury otherwise.”
At first blush this would seem to sustain the contention of the defendant in error, but the proposition is qualified by the language, “where the evidence justifies it.”
Judge Welch, in his clear and cogent opinion, says, at page 168:
*226 “We hold also that the court should have instructed the jury, as requested, that it was competent for them, if, in their opinion, the evidence justified it, to find the defendant guilty of an assault and battery only, and that the refusal of the court to give such an instruction was error to the prejudice of the defendant. It is true that if death resulted from the unlawful assault and battery, the assailant was guilty of manslaughter; but the jury might have found that it resulted from some other cause. Had the court charged the jury, that if they found that the death resulted from the assault and battery, they could not properly find him guilty of assault and battery only, the charge would have been right.”
Another well-considered case is that of Dresback v. The State, 38 Ohio St., 365, which also involves a charge of murder in the first degree. Justice White in his opinion says:
“The charge [of the trial judge], in effect, told the jury that their duty would be fulfilled, in case they found the accused guilty, by returning a verdict for. murder in the first or second degree, or for manslaughter. The evidence against the accused tended to prove that he purposely killed his wife by administering to her poison; and it tended to prove no other grade of offense. If the jury found him guilty, it was their duty to find him guilty of murder in the first degree; but if the charge was not proved he was entitled to an acquittal. The court, however, instructed the jury that they might, consistently with their duty, find him guilty of murder in the second degree, or of manslaughter.”
*227 Justice White clearly holds that the crime charged was first degree murder or nothing, because there was no evidence tending to prove any other grade of offense, and that, if that charge was not proved, the accused was entitled to an acquittal.
Defendant in error relies chiefly upon what may be considered as included offenses, as suggested by Section 13692, General Code:
“Upon an indictment, the jury may find the defendant not guilty of the offense charged but guilty of an attempt to commit it, if such attempt is an offense at law. When the indictment charges an offense including different degrees, the jury may find the defendant not guilty of the degree charged and guilty of an inferior degree thereof. If the offense charged is murder, and the accused is convicted by confession in open court, the court shall examine the witnesses, determine the degree of the crime and pronounce sentence accordingly.”
Now, what is meant here by degree of thé crime?
Upon a general plea of guilty could the court find the accused guilty of assault and battery ? It would be just as reasonable for the court so to find as for the jury upon trial so to find. If the assault was unquestionably fatal, if the wound made was unquestionably the proximate cause of the death of the deceased, what folly it would be to relieve the accused of his crime of murder by conviction for assault and battery, with two dollars and costs.
Under this statute, in a case of homicide, assault and battery is not one of the offenses mentioned as of an inferior degree. This assault, or assault and battery, plea, in connection with clear and un *228 doubted cases of murder, has been overworked to the great prejudice of the state, to the lessening of confidence in the judgments of our courts and juries, and to the undermining of the safeguards provided by law for the security and protection of human life.
The only case of murder brought to our attention where a contrary doctrine is held is that of Lindsey v. The State of Ohio, 69 Ohio St., 215. In that case, however, the question was as to whether or not there could be a valid conviction of murder in the second degree under the charge of murder in the first degree. The question of assault and battery was not raised.
We approve and adhere to the doctrine laid down in the cases of Marts v. The State, supra, and Dresback v. The State, supra, as the sounder and safer doctrine, and to the extent that the Lindsey case modifies that doctrine upon a charge of assault and battery the same is disapproved.
This assignment of error is not well taken and the court of appeals was right in so holding.
The fifth assignment of error urges that the statute, Section 12603, General Code, is unconstitutional and void for the reason that it does not observe the constitutional guaranty of sufficiently advising the defendant of the nature of the accusation against him, in that the statute is too indefinite and uncertain in its terms.
It is claimed that the words “reasonable” and “proper” are so general, comprehensive, and variable, that it would be impossible for the defendant to know, or for the jury to fairly de *229 termine, what was a violation of the statute; that juries in one case would hold a speed to be reasonable, while the same speed under the same circumstances might be held by another jury in the same county, at the same term, to be unreasonable. In short, it is urged that the statute should definitely fix what is a reasonable speed and a proper operation of a car.
The constitutional guaranty is in very broad terms. It is the defendant’s right “to demand the nature and cause of the accusation against him, and to have a copy thereof.”
The degree of particularity and specification required in the indictment is not fixed by the constitution, but rather is fixed by the decisions of our courts. There can be no violation of the constitutional provision in this respect, by reason of the generality and indefiniteness of any averment set forth in the statute, so long as the indictment does advise the accused of the “nature and cause of the accusation.” Yet courts ha’ve nullified statutes because the language was too uncertain and too indefinite to ascertain the meaning of the legislature, and also because the language did not in any wise advise the public as to what was or what was not an offense under it.
The legislature, however, in this instance, saw fit to fix no definite rate of speed for the car, except to require that the car should not be operated at a speed “greater than is reasonable or proper, having regard for width, traffic, use and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person.”
*230 In short, the legislature wrote into the statute what has become known as the “rule of reason” ever since the Standard Oil and Tobacco Trust cases were decided by the supreme court of the United States. (221 U. S., 1, and 221 U. S., 107.)
In those cases the supreme court of the United States read into the statute the so-called “rule of reason,” holding that the anti-trust act really was not a denial of all restraint of trade, but only a denial of unreasonable restraint of trade.
It would hardly be suggested that the supreme court of the United States read into the statute something that made the statute unconstitutional; or read into the statute something that made it so indefinite and uncertain that it was incapable of advising the public as to what was or was not an offense under it, or that made the statute practically unenforceable. And yet, by parity of reason, it is claimed in this case that the legislature, which wrote into the statute the same “rule of reason,” thereby in effect nullified such statute, because of the indefiniteness and uncertainty of its terms. The contention is not sound.
The suggestion that juries on the same state of facts may hold one way in one county, and another way in another county, indeed that in the same county upon the same state of facts one jury may hold one way and another hold another way, is no argument against this contention. That is inevitable under any system of jurisprudence on any set of facts involved in a criminal transaction. Courts differ in their judgment, juries differ in their judgment, but that is no reason for the abolition of *231 either, or for denying them jurisdiction sufficient to enforce the administration of statutes like the one in question.
In our whole criminal procedure, even in capital and the most atrocious cases, where a man’s life and liberty for life are involved, it is made the special province and duty of juries to determine what is “reasonable,” and whether or not there is a “reasonable” doubt of the defendant’s guilt. Of course that is a conclusion — almost incapable of precise and specific definition. What one jury might hold to be a reasonable doubt, another jury would hold the contrary; and still there is no way other than to leave the question to the jury to determine what is and what is not a “reasonable doubt.”
Again, one of the most common defenses interposed in prosecutions for murder is that of self-defense. It is the settled law of this state, as in most others, that if the defendant at the time of the killing bona fide believed himself to be in danger, whether he was or not, and had “reasonable” grounds for so believing, and used force pursuant to such situation, it is excusable homicide; and yet it is for the jury to put themselves in the situation of the parties, particularly that of the defendant, and determine from the evidence as to whether or not the defendant had “reasonable” grounds. And so it is throughout our entire criminal jurisprudence.
Our statute is much like the Massachusetts statute enacted in 1909, which reads:
“Every person operating a motor vehicle * * * *232 shall run it at a rate of speed at no time greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public.” Acts, 1909, p. 829.
Nebraska has a very similar statute, which has been upheld by the supreme court of that state in Schultz v. State, 89 Neb., 34.
A contrary doctrine has been held in Hayes v. The State, 11 Ga. App., 371, which principle was affirmed in Strickland v. Whatley, 142 Ga., 802, and also in Sloan & Billings v. Pasche, 153 S. W. Rep., 672, by the Texas Civil Appeal.
We feel the Massachusetts, and Nebraska doctrine is much more conducive to public safety and the needs of all the varying situations in public travel than is the doctrine laid down by the courts of Georgia and Texas.
The first Ohio statute enacted using similar language was passed in 1906 (98 O. L., 320). The body of that act reads:
“No person shall operate a motor vehicle on a public .highway at a rate of speed greater than is reasonable or proper, having regard to the traffic and use of the highway, or so as to endanger the life or limb of any person, or the safety of any property.”
We are not advised as to the number of automobiles in the state of Ohio at that time, but the situation created by their operation on the public highways was of such a dangerous nature that the legislature in the exercise of its police power thought it desirable, if not imperative, to enact some such legislation.
*233 The first year for which official statistics are available as to the number of automobiles operated on the public highways of this state is 1908, when 18,000 were in operation. To-day the total number is over 300,000. If there was. need for some such statute in 1908, there is more than ten times the need of it to-day.
Statisticians have calculated that when you vest average men with large power, you make either a tyrant or fool out of ten per cent, of them. The estimate is very conservative. Indeed, if it err at all, it is upon the ground that it is too low, and it may well be doubted if the ratio is appreciably, reduced in case of putting 300,000 automobiles, with their tremendous speed, power and impact, under the direction and control, or lack thereof, of the usual drivers. Ten per cent, of the 300,000 would make 30,000 that are in the hands of tyrants, fools or incompetents, speed-maniacs, that are a constant menace and danger to the safe and conservative 90 per cent, of 'automobile drivers, to other vehicle drivers, and to the millions of foot passengers.
“Safety first” must not be sacrificed for “speed first.”
The daily press is full of hairbreadth escapes and casualties, from slight injuries on the one hand to instant death on the other. It may well be said, “that the railroad locomotive has killed its hundreds, but the automobile is killing its thousands.”
The day has long been here when, the authorities should exercise every power under every law of the state to protect the safety of the public, its life, *234 its limb; and in order to meet every possible situation of danger, some such general, comprehensive and elastic statute as Section 12603 is absolutely necessary.
The careful, conservative driver need have no fear of it. The reckless, wanton speed-maniac needs to be kept in fear of it. The life of the humblest citizen must be placed above the gratification of the motor-maniac who would turn the public highways into a race course. Mere civil liabilities are not sufficient to protect the public. Five dollars fine and costs is a joke in most cases.
Some statutes have undertaken to fix a rate of speed which would be prima facie dangerous, but a rate of speed dangerous in one situation would be quite safe in another situation, and if the rate of speed were definitely fixed, naturally it would have to be the minimum speed at which cars might be safely driven, because that speed would have to be a safeguard against every possible situation which would be perilous even at a speed of six or eight miles an hour.
There is no place in all the public grounds and parks where a situation is not constantly changing from comparatively ho traffic to a most congested traffic; from no foot travelers to a throng of them; from open and clear intersections, private drives and street crossings, to those that are crowded; from free and unobstructed streets to streets filled with crowds of foot travelers and others getting off and on street cars and other vehicles. In order to meet these varying situations and impose upon the automobilist the duty of anticipating *235 them and guarding against the dangers that arise out of them, this statute was evidently passed in the interests of the public safety in a public highway.
The supreme court of Tennessee has laid down the law in a very well-considered opinion by Neil, C. J., in Lauterbach v. State, 132 Tenn., 603, decided in 1915. The syllabus of that case reads as follows:
“1. Where defendant, while driving an automobile in excess of 20 miles per hour, in violation of Pub. Acts 1905, ch. 173, killed a child who ran out in front of the automobile, he was guilty of felonious homicide, since he was negligent in violating the statute.
“2. One who, while violating the law by speeding an auto, kills another is not relieved by the fact that the other ran in front of the auto, since he is presumed to anticipate the possibility of any result of his recklessness.
“3. One who, while violating a law, kills another is not relieved by the negligence of the other, for the doctrine of contributory. negligence does not apply to criminal acts.”
Chief Justice Neil in the course of the, opinion says, at page 606:
“The plaintiff in error is not relieved by the fact that the child ran suddenly in front of the machine. One who is engaged in the performance of an unlawful act must take the criminal consequences of whatever happens to third persons as a result of that act. It was his duty to anticipate that he might encounter, not only grown persons, but even little *236 children, or even people who were afflicted with blindness or deafness. One who disobeys the statutory rule as to. speed is acting in defiance of law, and must be held to have anticipated the possibility of any injury caused by his recklessness.”
The paramount humanitarian purposes of this statute, and its adaptability to meet every dangerous situation, for the safeguarding of life and limb against the aggression of reckless and wanton automobile drivers, commend it as a valid enactment, and the court of appeals was right in upholding it.
Absolute or mathematical certainty is not required in the framing of a statute. Reasonable certainty of the nature and cause of the offense is all that is required. Some offenses admit of much greater precision and definiteness than others, but it is quite obvious that in the case at bar the statute must be sufficiently elastic and adaptable to meet all the dangerous situations presented, in order to adequately safeguard the traveling public, whether foot passenger, horse or motor vehicle.
Section 12603 is as definite and certain on the subject-matter and the numerous situations arising thereunder as the nature of the case and the safety of the public will reasonably admit.
We come now to the sixth assignment of error, that the court failed to properly charge as to the terms of the statute with reference to “what would be a reasonable and proper operation of an automobile” under this statute.
The court of appeals reviewing the charge of the court in this respect says:
*237 “It is the duty of the court to define the terms used in the statute so that the jury may have a basis for determining when a crime has been committed — not to leave it to the will and whim of each juror to construe the statute and determine what would be a reasonable and proper operation of an automobile under the conditions of the particular case. * * * we think that the jury should be more definitely charged as to what conduct would constitute a crime under the terms of this statute than was done by the trial court in his charge in this case.”
Now, if there was anything about this statute that was uncertain, indefinite; anything technical or unusual in its words or terms; then it would be quite clear that there should be a definition of terms, a construction of doubtful and a definition of difficult language. But what is there about the statute that either requires or permits any construction or definition?
The part of the statute in question is this:
“Whoever operates a motor vehicle * * * at a speed greater than is reasonable or proper, having regard for width, traffic, use and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person,” etc.
It should be remembered in this connection that the statutes of the state of Ohio are made not only for lawyers and courts, but for the five million people who reside in the state. Statutés should be so plain, so simple, that any ordinary man can easily understand their meaning, and when that meaning *238 is thus dear and plain a court has no right to construe the language, because it needs no construction, and any attempt at definition instead of clearing the statute usually clouds it. ■
What word or words of this statute are not as entirely familiar to the average juryman as to a trial judge? Indeed the general assembly ought to be commended for making a statute in the simple speech in which we find Section 12603, General Code.
The trial court refers to the statute and quotes it literally and in substance again and again throughout the charges, so that there could be no possible misunderstanding by the jury of the simple meaning of this statute as applying to any given state of facts.
There was no question but that there was a highway ; no question but that there was a motor vehicle or automobile; no question about the width, traffic, use, general and usual rules of the road and highway; no question as to what the word “endanger” meant, or “property,” “life” or “limb.” What was there for the court to further define or construe?
The presumption is that every man knows the law, and this applies as well to the public as to the jury and the judge, and when it is in such simple terms, such simple language, as the statute here involved, there can be no doubt about its meaning.
Helpful suggestions as to instruction required of a trial judge upon the subject of “reasonable doubt,” as applied to criminal cases, should aid us in determining the validity of this statute as to “reasonable and proper speed.”
*239 In Miles v. United States, 103 U. S., 304, Justice Wood has said (page 312):
“The evidence upon which a jury is justified in returning a verdict of guilty must be sufficient to produce a conviction of guilt, to the exclusion of all reasonable doubt. Attempts to explain the term ‘reasonable doubt’ do not usually result in making it any clearer to the minds of the jury.”
This same doctrine is approved by Justice Brewer in Dunbar v. United States, 156 U. S., 185.
In State v. Reed, 62 Me., 129, 142, it was said: “The explanations of the meaning of this phrase [reasonable doubt] have been almost innumerable, and the best jurists have found it difficult to convey to their own satisfaction the idea in their own minds expressed by its use. Not that there is any considerable difficulty in understanding its meaning, but rather in not conveying it. It may indeed admit of grave doubt whether the proposition is in itself so simple and the words so well calculated to express a state of mind so easily felt, though difficult to describe, that in most cases it is sufficient to use the expression alone without any attempt at explanation. All such attempts must result in simply stating the same proposition in a different form of words, and words which are, perhaps, no more easily understood. * * * When told that, in order to convict, the proof must remove every reasonable doubt of guilt from their minds, whatever the form of words used, if any heed is given to the instruction the result must be that each individual juror will understand it and act according to the dictates of his own reason.”
*240 In State v. Davis, 48 Kans., 1, complaint was made that the trial judge had failed to explain the meaning of the words “reasonable doubt.” Held, “that such failure to define or explain the meaning of such words is not error.”
In the opinion it is said:
“It is presumed that the jury understood what the words 'reasonable doubt’ meant. The idea intended to be expressed by these words can scarcely be expressed so truly and so clearly by any other words in the English language; and, generally, the attempted definitions of them by courts or others are simply misleading and confusing, and not proper explanations of their meaning at all. There are definitions or paraphrases of these words, however, which have been held to be good by the courts, but even they are scarcely as good as the words themselves. We do not think that the court below committed any material error in refusing to define these words.”
Numerous cases can be found in Ohio where criminal cases have been reversed because the trial judge gave an improper definition of the words “reasonable doubt,” but none has been found where a case has been reversed because the court failed to define “reasonable doubt.”
But had such a charge been fairly required by the evidence in the case, there was still no error, because there was no request so to charge. Counsel cannot sit by and note that the court has inadvertently omitted something in the charge that ought to be given, and not advise the court of such omission, and then thereafter predicate error on *241 such omission. Hence the rule of law is well established that before such omission can be used as the basis of a proceeding in error, the court’s attention should be challenged thereto.
Counsel for the defendant, however, evidently regarded the matter as unimportant, for their general vigilance in the trial of the case is quite apparent when it is remembered that they offered 17 written requests to charge and noted 17 exceptions to the charge, though in neither request nor exception did they raise this question upon which the court of appeals reversed the case. And the rights of the accused were in no wise jeopardized by his failure, through his counsel, to make such request, for the reason that the evidence overwhelmingly, and beyond the peradventure of a doubt, supported the charge of the state on these several matters, and, therefore, a special charge in that behalf was wholly immaterial and unimportant so far as the rights of the defendant were concerned. We are not hereby relieving the trial judge of his plain duty to charge in a criminal cause upon all the essential issues raised either by the indictment or by the evidence; but no judge is infallible and may inadvertently omit to charge on some matter most vital to the substantial rights of the accused. It then becomes the duty of the defendant, or his counsel, to challenge the court’s attention to such omission. Jones v. The State, 20 Ohio, 34, and Doll v. The State, 45 Ohio St., 445, 452.
There was no error in the charge of the court in this respect, though the language used by the trial judge was not always well chosen.
*242 In determining whether or not the defendant was driving his car at a speed greater than reasonable or proper, as required by the statute, the court should have told the jury that the defendant’s conduct in that respect was to be judged according to the conduct of an ordinarily prudent person in such a situation. No request, however, was made in respect to this, and doubtless the court inadvertently omitted it. In this particular case such omission was not prejudicial error.
The seventh and last error complained of relates to the matter of proximate cause, and grows out of this part of the charge:
“If you shall find from the evidence, beyond a reasonable doubt, that this defendant, E. E. Schaeffer, was at that time violating the provisions of that act and struck this child with his automobile, and also find beyond a reasonable doubt that the child died from the effects of such injury, then jour verdict should be guiltj as charged in the indictment.”
The trial court here, in effect, charged the correct legal proposition as to proximate cause, without, however, putting on the label.
But it is not always necessary to use the term “proximate” or “proximate cause” in order to correctly charge thereon. No question was raised in dispute of the fact that the automobile killed the child, and it further appearing that this was the undoubted result of the unreasonable and improper speed at which the automobile was then being operated, there was no prejudicial error resulting to the defendant,
*243 True, the language of the statute does not clearly indicate that death must be the proximate result of the unlawful act, since the word “in” seems to indicate “at the time thereof” rather than “thereby.” Yet the safer and sounder doctrine seems to be recognized in most of the states that the unlawful act must be a proximate cause of the killing.
So obvious and so manifest did this appear throughout the case that the defendant in error’s counsel did not even suggest any further charge by the court upon the question of proximate cause.
Upon a careful examination of the entire record of this case, and all the evidence before the court and jury, we are convinced to a moral certainty that the defendant was rightly convicted by the jury, and that any technical error of the court, or any error in the charge with reference to proximate cause, was, in this case, in no wise prejudicial. Substantial justice has been done.
The witnesses for the state furnished overwhelming testimony of the truth of the charge of the indictment. No one denied it but the defendant himself. His testimony that he was going but eight miles an hour at the time he struck this child, and that he never saw the child, and didn’t know he had struck it, and his subsequent conduct upon his return home, abundantly warranted the jury in returning the verdict they did. To have done anything else would have been the grossest miscarriage of justice.
This three-year-old boy, the testimony all shows, was crossing the street at a regular street crossing, *244 was at the time occupied in playing with a large number of other children who were there upon the street, which the defendant says was customary; and he admits that he saw a large number of them on the street at the time he was making the fatal trip. His conduct in the operation of this car, not only as to speed, but in being on the left side instead of the right side of the street, was wholly inexcusable and shows a reckless and wanton disregard of all thought for the safety and lives of these children .and the public generally.
The judgment of the court of appeals is reversed and that of the common pleas court affirmed.

Judgment reversed.

Nichols, C. J., Newman, Jones, Matthias and Johnson, JJ., concur.