NOT DESIGNATED FOR PUBLICATION

No. 113,263

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.W.,
A Child Under Eighteen (18) Years of Age.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed November 13, 2015. Affirmed.

*Jean Ann Uvodich*, of Olathe, for appellant natural father.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before MCANANY, P.J., GARDNER, J., and WALKER, S.J.

*Per Curiam*: Father appeals the district court's order terminating his parental rights to his son, R.W. Mother had her parental rights to R.W. terminated in the same order, but she is not a party to this appeal and will only be discussed herein as relevant. Finding no error in the district court's orders, we affirm.

PROCEDURAL BACKGROUND

On November 27, 2012, the State filed a petition alleging that R.W., born in 2012, was a child in need of care (CINC) because (1) he was without adequate parental care, control, or subsistence not due solely to the lack of financial means of his parents; (2) he was without the care or control necessary for his physical, mental, or emotional health;

1

and (3) he had been physically, mentally, or emotionally abused or neglected or sexually abused.

The petition noted that Father was R.W.'s putative father. R.W. was brought to the attention of the Kansas Department for Children and Families (DCF) after he was born in a car and tested positive for methamphetamine and cocaine. Mother was a known drug user and prostitute and had other children who had been adjudicated as children in need of care. Mother had prearranged for R.W. to be adopted by S.H. and M.H. (the foster parents).

The petition also stated that on November 26, 2012, Father informed a social worker that he wanted custody of R.W. and claimed that he had the means to support and provide for R.W., but he could not provide concrete examples of such support and lived in a home that was not up to code. Father indicated that he could move. The petition noted that Father had visited R.W. in the hospital four times for 15 minutes each and had not held R.W. The petition raised concerns that Father might not be R.W.'s biological Father, and he did not have a way to care for a newborn at that time.

At 10:44 a.m. on the day that the State filed the petition, the district court scheduled a temporary custody hearing for 1:30 p.m. that day. Father sought a continuance due to the short notice, but the district court denied the request but set the matter for rehearing at a later date. The district court then determined that reasonable efforts were not required to maintain R.W. in the home because an emergency existed which threatened his safety. As support for that finding, the district court noted that R.W. was born with methamphetamine and cocaine in his system, that Mother may have engaged in prostitution and drug use while pregnant, and that there was no father listed on the birth certificate. Because there was some question that Father may not be R.W.'s biological father and because Father's home was considered inappropriate for placement

2

due to a number of safety concerns, the district court placed R.W. in the custody of DCF and ordered Father to submit to genetic testing to determine paternity.

At an evidentiary rehearing conducted on January 9, 2013, Father supplied the district court with proof that he was R.W.'s biological father. Two days later, the court found probable cause that reasonable efforts had been provided to prevent the removal of R.W. from the home and that it was contrary to R.W.'s welfare that he be placed in Father's home. The court also found that notice of the temporary custody hearing did not violate Father's due process rights under K.S.A. 2012 Supp. 38-2243. Father appealed this latter ruling, but the appeal was dismissed by this court as moot.

At a hearing conducted on May 17, 2013, the district court found by clear and convincing evidence that R.W. was a child in need of care pursuant to K.S.A. 2012 Supp. 38-2202(d)(2), and it ordered Father be afforded a 4-month reintegration plan. In making this determination, the court noted the dates and durations that Father had spent with R.W. in the hospital and concluded that he was not there long enough to establish a bond with R.W. or to give others a level of comfort that he intended to parent R.W. It found that the foster parents had spent significant time bonding with R.W. The court noted that Father had failed to articulate a specific plan for caring for R.W. when asked, and an inspection of his home showed that it had numerous safety concerns and showed no preparation for a baby. It further found that Father remained vague when questioned about his plans and had to be told what to do to care for R.W. despite the fact that he was not a first-time father.

At a permanency hearing conducted on November 25, 2013, the district court ordered continued efforts at reintegration. At a permanency hearing conducted on November 24, 2014, the court found that reasonable efforts had been made to accomplish reintegration, and it changed the permanency plan goal to adoption.

3

On April 9, 2014, the State filed a motion for finding of unfitness and termination of parental rights or appointment of permanent custodian. The motion hearing was conducted over 4 separate days, August 6, 7, 8, and 11, 2014. On December 29, 2014, the district court entered its order terminating the parental rights of both Father and Mother. Father has timely appealed the court's order. Mother has not appealed.

FATHER'S DUE PROCESS CLAIMS

Father first argues that his due process rights were violated when he was given only 3 hours' oral notice of the initial temporary custody hearing. He asserts that the plain language of K.S.A. 2012 Supp. 38-2243 requires the State to give a parent 24 hours' notice of the temporary custody hearing unless the parent receiving notice consents to the hearing being conducted on shorter notice. The statute provides that the district court may continue the hearing to afford 24 hours' notice, and Father asserts that the court violated his due process rights by failing to continue the hearing as he had requested. He asks this court to set aside the district court's orders as a result of this hearing. Additionally, Father argues that the oral notice he received about this hearing was not completed because no certificate of oral notice was ever filed.

The State argues that this issue is moot because Father filed an appeal after the temporary custody hearing, the State filed a motion for finding of mootness, Father failed to reply, and this court dismissed the appeal as moot. It asserts that Father abandoned his claim on this issue when he failed to contest its motion to dismiss. The State also contends that this issue is moot because this court has previously held that once a child has been adjudicated a child in need of care, any issue with the temporary custody order is moot.

An order of temporary custody is an order from which a party may take an appeal. K.S.A. 2012 Supp. 38-2273(a). But the State points this court to *In re A.E.S.*, 48 Kan.

4

App. 2d 761, 298 P.3d 386 (2013), which addressed when a temporary custody order becomes moot. That panel determined that when the district court adjudicated the child to be a child in need of care and ordered continued custody with DCF, the CINC order regarding custody of the child superseded the temporary custody order, thereby eliminating any remaining justiciable controversy regarding custody arising from the temporary order. 48 Kan. App. 2d at 765.

We agree with the State's position. *In re A.E.S.* certainly demonstrates that any issue regarding custody as it pertains to the initial temporary custody order in this case is moot. The district court conducted a rehearing on the issue and again ordered that DCF be given temporary custody of R.W. Thereafter, the court adjudicated R.W. to be a child in need of care and ordered continued custody of R.W. with DCF.

But even if we were to find that Father was technically denied his due process rights under the temporary custody statute, he has not demonstrated any actual harm. A constitutional error which denies a party due process will be held harmless if this court finds beyond a reasonable doubt that the error had no impact on the outcome of the matter. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Here, at the first temporary custody hearing, the district court did not allow Father to have custody of R.W. because there was some question that Father may not be R.W.'s biological father and because Father's home was considered inappropriate for placement due to a number of safety concerns. Had Father had an additional 21 hours to prepare for this hearing, there is no question that the outcome of the hearing would have been the same. Twenty-one additional hours would not have been long enough for Father to conclusively establish his paternity, fix all of the safety concerns at his home, and have another inspection of his home. This conclusion is logical when one considers that the court conducted a meaningful, evidentiary rehearing of which Father had ample notice.

At that hearing, Father was able to establish his paternity, but he still had not readied his home for R.W. Any due process violation here was harmless beyond a reasonable doubt.

THE DISTRICT COURT'S TERMINATION ORDER

For his second issue on appeal, Father argues that the district court erred in finding that he was unfit as a parent. The court did so on four bases, each of which are discussed below with Father's arguments on each.

Because of the large amount of evidence presented to the district court at the termination hearing, and in order to understand the disputed interpretation of that evidence made by the parties, it will be necessary to set out the court's findings in considerable detail before discussing the court's conclusions.

The pertinent factual findings of the court that bear on the issue of terminating the Father's parental rights are the following:

> "The Court first notes that [Father] is approximately sixty years of age. He claimed to have raised three biological children and three stepchildren, all of whom are now adults. Julie Williams, [KVC] case manager, testified at the August 2014 trial. She began working on this case in February 2013 and as of trial remained as case manager. She noted that the initial concerns when [R.W.] came into State custody were with the mother's ability to parent the child, her usage of illegal and dangerous drugs, her ability to provide stable housing for the child, that [R.W.] was a medically fragile child and at the time of discharge paternity had not been established and there was no one with whom to release the child.
>
> "During a visit on February 7, 2013 [Father] asked how to make a bottle and how much water needed to go in the bottle, and also had to be reminded continually to support his infant son's head during the visits. On February 11, 2013, the visit was moved to Elizabeth Layton Center in Miami County where [Father] was participating in services called parent child attunement. The individual providing that parent child attunement

6

therapy, Betsy Scott-Teigen, testified at trial that this type of therapy is 'a standard evidence based practice that focuses on skill set of parental attachment and attunement to your child which is demonstrated through observations of the client, their interaction with their child.' [Citation omitted.] She went on to state that upon completion of the program, [Father] would have been observed within a five-minute observation time that he was able to have '10 descriptions to this child, 10 reflections of his child, verbalizations, 10 labeled praises to the child of what they are doing well, and at least three or less questions to his child, indirect commands and direct commands to his child.' [Citation omitted.] Ms. Scott-Teigen also noted that in parent child interaction therapy, [Father] would be 'allowed to make three or less statements that would be negative questional [sic] commands, or the example of the statement that you gave to me ["Oh you lazy baby. Why aren't you holding your bottle." (citation omitted)] would have been a negative statement. So he would be allowed to do three or less of those.' [Citation omitted.] [Father] participated in this program from April to August 2013, was considered to have completed parent child attunement therapy, and was discharged from that therapy with his son.

"Ms. Williams observed [Father] to make the following statements to his son or about his son during visits:

"1. 'Oh you don't like a diaper at all. You would walk around naked if you have to.'

"2. 'You are not talking very much. You spend a year trying to get them all to talk and then 18 years trying to get them to shut up.'

"3. After burping [R.W.] said: 'Here you go. You are just a gas bag.'

"4. [Father] also told his [adult] son that he 'had to hold his melon and not let it flop around.' (The word 'melon' is [Father's] term for his son's head.)

"5. At the February 28, 2013 visit, Ms. Williams noted that [Father] commented while changing [R.W.'s] diaper that [R.W.] was more trouble than he was worth.

"On March 1, 2013, [Father] contacted the case manager and asked for more visits with his son because his attorney had 'chewed him out' for not asking for longer visitation. [Father] was advised that this was possible, but that a walk through of his home would be necessary and that he would also have to decide if he would be remaining in his home in Paola or if he would be moving to his home in Osawatomie. There were appreciable differences between the two homes: the home in Paola did not meet safety standards, it had no working heat, tarps were covering windows and the doors did not

lock properly. While [Father] consistently said that he preferred to live in this house, he did tell KVC he would move if he had to into his home in Osawatomie. KVC made it clear that he needed to decide. A similar conversation was held another time with [Father], causing the case manager concern that they were having the exact same conversation. [Father] continued to state that he preferred the home in Paola, and that his adult son [E.] would live there with him so that he could help care for [R.W.]. At one particular visit, which was attended by his adult daughter [C.M.], that [Father] spent 15 to 20 minutes interacting with [R.W.] in the one hour allotted for the visit. At this visit, Ms. Williams heard [Father] refer to the child's car seat as a 'to go box.'

"At a visit on March 21, 2013 Ms. Williams advised [Father] that [R.W.] was fussy and appeared to not be feeling well, as he cried during much of the visit. [Father] made comments to his son like 'oh that sounds fake to me' and 'I think you feel fine.' When [Father] was instructed to mix [R.W.'s] formula with Pedialyte, [Father] did not understand why Pedialyte was used for a sick child and then fed the bottle of Pedialyte directly to [R.W.] instead of mixing it with his baby formula.

"At another visit, [Father] brought a metal bottle cap the size of a quarter as a toy for [R.W.] to play with, causing concern for the case manager. [Father] also made the comment that he had the right to complain because his son had gone through two diapers in one day. At a visit on April 18, 2013, which was attended by both [Father] and his adult daughter, [C.M.], [Father] kept telling his 5-month-old son to stand up and walk. He said things like 'Stand up you lazy boy, stand up.' [Father] also commented to his daughter that [R.W.] might be getting teeth, so they should get [R.W.] something to chew on, like a dog bone. Ms. Williams noted that [Father] was still placing newborn size diapers on [R.W.] when he was currently in a size two diaper, and that [Father] was feeding him only two ounces of formula when [R.W.] was actually consuming anywhere from four to six ounces. [Father] was also overheard to make a comment to his daughter that they should get something like dog biscuits for [R.W.] to gnaw on, but thought perhaps those had been outlawed.

"Following that April 18 visit, a walk through was done of [Father's] home in Osawatomie, where he had decided to reintegrate with [R.W.]. Concerns noted by Ms. Williams were that there was a heater that was exposed and covered with chicken wire surrounding it. Upon sharing this concern, [Father] said he would get another box heater, but that he would only be living in the home in Osawatomie when he had 'the kid.' Ms. Williams testified that [Father] throughout the case frequently referred to [R.W.] as 'the

8

kid' instead of by his given name. Ms. Williams' additional concerns about the home involved a door that did not shut all the way and that fingers might get stuck.

"Ms. Williams testified that following the CINC trial in May 2013 a four-month reintegration plan was offered to the father, that she prepared this plan and that she reviewed the tasks on the plan personally with [Father]. Ms. Williams noted that the goal of a reintegration plan is to look for a change in the way a person actively parents their child and if they are able to take what is written in the plan and actively implement it in their lifestyle and their parenting styles. Based upon concerns already noted prior to the creation of the formal reintegration plan, Ms. Williams testified that she was 'seeking an overall change in [Father's] ability to recognize and change safety concerns both within the community and within his home, appropriate nutrition, appropriate development for a child and also be able to respond to those things appropriately.' [Citation omitted.]

"Within a week of reviewing the reintegration plan with [Father], Ms. Williams sent a letter to [Father] advising him of a new increased schedule of visitation of unsupervised visits for the father in his Osawatomie home, as well as a safety plan stating that [Father] was not to take [R.W.] to the home in Paola, and that the biological mother was not allowed to be around [R.W.].

"On June 12, 2013, Ms. Williams was notified by [S.H.], the foster mother, that when she picked [R.W.] up from his visit with his father the previous day that the child's clothes were soaked in urine. When asked, [Father] acknowledged that the clothes were wet, but that he didn't know how it had happened. Following the next visit on June 18, 2013, the foster mother reported to the case manager that [R.W.] had come back from the visit hungry and tired. It was reported that [R.W.], within two hours of returning to the foster home, drank twelve ounces of formula and that he slept through the night only waking once. The amount of formula consumed and the waking only once were highly unusual for the child.

"Following another visit, Ms. Williams had a telephone conversation with [Father] who indicated that he felt he had to have his adult son or daughter with him at all times during visits because he needed a witness to whatever he did with his son. [Father] also indicated that he had gout in his feet, that this was one reason he was receiving disability, and that gout would prohibit him from running after [R.W.] if that became necessary. During another telephone conversation, [Father] stated that the urine-soaked clothes were because he had been in a hurry and had not had time to change [R.W.'s] diaper, and with regard to the time that [R.W.] got back to his foster home tired and

9

hungry, [Father] stated that [R.W.] had a fever and that he did not want to feed a child with a fever, and because he had given [R.W.] Tylenol he did not want to feed [R.W.] anything else.

"Following that conversation, visits were pulled back to supervised. [Father] was not happy receiving this information. He accused Ms. Williams of having a conflict of interest and of having a bias in favor of the foster mother. Ms. Williams testified that [Father] stated: 'if [R.W.] comes back with a pimple on my ass, then it is all my fault and that the air conditioning in the DCF building goes up and down and he is being blamed for that.' At this time (end of June 2013), [Father] also stated to Ms. Williams that he was no longer participating in services with the Elizabeth Layton Center.

"July 5, 2013 was the first visit that was supervised after the visits were pulled back. Ms. Williams testified that [Father] initially appeared bored by the visit. He then began speaking to [R.W.] and said he wanted to see [R.W.] exercise and stood him up on his legs. [R.W. became] fussy, and [Father] said to his son 'I don't care if you are bored, but life is boring.' Later he sat down with [R.W.], and kept trying to stand [R.W.] up on his legs saying 'Stand up, stand up, you are just the laziest baby I have ever met.' At the next visit, July 9, 2013, [Father] placed [R.W.] on a towel and said "Why aren't you crawling? You should be crawling by now. You are really just the laziest baby I have ever met.' Ms. Williams observed [Father] making a bottle for [R.W.], and noted that [Father] did not appear to be concerned about making the bottle of formula correctly.

"At a visit on July 30, 2013 [Father] made a bottle for his son, and kept trying to get [R.W.] to hold the bottle saying 'Come on, hold the bottle, you are just lazy, you can't even hold your own bottle.' Ms. Williams testified that she did not believe comments such as this were appropriate.

"Visits were missed in August of 2013 because Ms. Williams was unable to contact [Father]. When she was able to contact him, [Father] told her he was in the hospital recovering from a vicious dog bite and that he was not able to participate in visitation for a while. This information turned out to be untrue, and the story was later changed by [Father] to reveal that he had ended up needing open heart surgery and was in intensive care for a period of time recovering from surgery. Visits resumed at the end of September 2013. [Father] told the case manager that he was under a 10-pound weight restriction in terms of lifting.

"The case manager stated that her concerns about the father and his health were based upon the fact that [Father] is in his sixties, that he claims that he is on disability for

10

gout, and that the open heart surgery came with it restrictions on lifting. She noted that a common theme throughout the visits was that [Father] tried to avoid physical activity—preferring to sit and observe [R.W.] playing rather than walking around holding his son. Ms. Williams noted that she repeatedly had to ask if the weight restriction had been lifted.

"During a follow-up conversation with [Father] following an October 10, 2013 visit, Ms. Williams asked [Father] about a concern that he had driven over a sidewalk and grass to get out of the DCF parking lot rather than using the actual driveway, to which he responded by saying: 'Well, who is she? The police officer now? I am really getting tired of [S.H.]. She stood up in court and lied like a dog and she gets all of her information from Ginny who is a crackpot, and I am sick of them.' [Citation omitted.] 'Ginny' was later identified to be . . . the maternal grandmother of [R.W.]. [Father] consistently made negative comments about the maternal grandmother and [the foster parents] throughout the course of the case to KVC."

After making these factual findings, the district court also noted its opportunity to observe the demeanor of Father at multiple hearings in the case, including the 4-day termination trial. The court remarked he appeared "sleepy and disinterested" in the proceedings. The court then commented that this attitude had manifested itself beginning at the original adjudication hearing, when he came across as "vague, passive, and without any strong conviction as to what his plans were to care for his son." Though Father clearly knew his son was "medically fragile," the judge found at the time that Father "gave bizarre responses to all who asked him how he intended to care for his medically fragile son." The court concluded at the original CINC adjudication that "[h]e himself chose not to spend important time made available to him to bond with his son."

At the termination hearing, the district court expressed even more acute concerns. The court ultimately agreed with the recommendations of the long-term case manager by making the following observation:

"The case manager stated at the August 2014 trial that, in her professional opinion given [Father's] current mental health state, his lack of participation in individual services as well as the lack of ability to provide substantial change in his parenting and his ability to understand [R.W.'s] continuing developmental and nutritional needs, it was not in [R.W.'s] best interest to reintegrate with [Father]. She further noted her concerns with [Father's] refusal to sign a release based upon concerns that he had been hospitalized at Osawatomie State Hospital (a psychiatric facility), concerns about his honesty, as well as concerns about his conflicting stories about where he was actually living.

"[Father] began the case with supervised visitation with his son, which were then moved to monitored and then unsupervised which included overnights. Those overnight and unsupervised visits were then curtailed based upon concerns that [R.W.] was returning from extended overnights with his father with bumps and scratches and other health concerns (such as thrush) together with [Father's] denial that they even existed. [Father] would say he didn't know how they occurred, or he would accuse the foster parents of lying. The visits were also curtailed due to concerns about [Father's] mental health and his lack of involvement with individual services. Ms. Williams was concerned that [Father] was not exhibiting proper parenting skills and was not treating his son in an age appropriate manner, such as insisting on feeding him food for crawling babies, as opposed to a child [R.W.'s] age who had teeth."

A district court may terminate parental rights when it finds by clear and convincing evidence that the parent is unfit and the reason the parent is unfit is unlikely to change in the foreseeable future. K.S.A. 2014 Supp. 38-2269(a). K.S.A. 2014 Supp. 38-2269(b) lists nonexclusive factors the court shall consider in making its determination of unfitness, and subsection (c) provides a nonexclusive list of factors the court must additionally consider when, as here, the child is not in the physical custody of the parent. Any one of the factors in subsection (b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2014 Supp. 38-2269(f). The "foreseeable future" should be considered from the child's perspective, recognizing that a child's perception of time is different than that of an adult. *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001).

12

This court's standard of review on a district court's determination that a parent is unfit requires it to determine whether, after review of all the evidence viewed in the light most favorable to the State, the court is convinced that a rational factfinder could have found the determination to be highly probable, that is, by clear and convincing evidence. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255, *rev. denied* October 7, 2010. This involves determining whether substantial competent evidence—meaning legal and relevant evidence as a reasonable person would accept as sufficient to support a conclusion—supports the district court's findings. It does not involve the reweighing of evidence or the determination of the credibility of witnesses. *In re M.B.*, 39 Kan. App. 2d 31, 44, 176 P.3d 977 (2008).

*K.S.A. 2014 Supp. 38-2269(b)(4)*

K.S.A. 2014 Supp. 38-2269(b)(4) allows for a finding of parental unfitness due to "physical, mental or emotional abuse or neglect or sexual abuse of a child."

The district court found Father unfit under this factor due to the emotional and physical neglect of R.W. "due to his inability or unwillingness to learn and educate himself on the proper and safe care for his son; his consistent negative comments to and about his son, and his paranoid and unreasonably suspicious attitude toward the foster parents and the KVC case manager." It also concluded that the evidence had shown that "[Father] can neither recognize nor learn to be able to recognize the emotional and physical needs of his son."

"Neglect" is defined in the act as

"acts or omissions by a parent, guardian or person responsible for the care of a child resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian. Neglect may include, but shall not be limited to:

13

(1) Failure to provide the child with food, clothing or shelter necessary to sustain the life or health of the child;

(2) failure to provide adequate supervision of a child or to remove a child from a situation which requires judgment or actions beyond the child's level of maturity, physical condition or mental abilities and that results in bodily injury or a likelihood of harm to the child; or

(3) failure to use resources available to treat a diagnosed medical condition if such treatment will make a child substantially more comfortable, reduce pain and suffering, or correct or substantially diminish a crippling condition from worsening." K.S.A. 2014 Supp. 38-2202(t).

"Harm" is defined as "physical or psychological injury or damage." K.S.A. 2014 Supp. 38-2202(l).

There was no evidence that Father had failed to provide R.W. with food, clothing, or shelter necessary to sustain R.W.'s life or health beyond some evidence that could support a finding that Father had occasionally fed R.W. an inadequate amount of food. There was no evidence presented that this had caused or was likely to cause harm to R.W.

The State presented evidence of situations where Father did not immediately react to what could have been a dangerous situation for R.W., such as when R.W. was messing with the toaster cord or trying to climb the stove to get to his snacks. But the evidence demonstrated that Father was supervising those situations, understood the danger, and did act to remove R.W. from the danger, though maybe not as quickly as Williams would have liked. The evidence did show that Father could recognize potential danger and would step in to keep R.W. from harm, such as when he took his glasses case away from R.W. when he began to hit himself with it, or when R.W. reached for an oscillating fan and Father redirected him to some pictures on the wall that R.W. could touch and smack instead. Father's parenting style was certainly demonstrated to be a bit more hands off than might be typically considered safe.

14

Additionally, there was no evidence presented that Father had failed to use resources available to treat a *diagnosed* medical condition. To the contrary, the evidence showed that he followed treatment and prevention directions. The evidence also showed that Father would reach out to R.W.'s pediatrician when he had questions about R.W.'s medical conditions. There is evidence in the record that Father was not fully attentive to the medical needs of R.W. by not properly detecting and obtaining medical attention for thrush or diaper rash. The court obviously gave considerable weight to evidence of this sort, which would support its conclusion of neglect of R.W.'s medical condition.

Though the district court did not specifically find physical or emotional "abuse" in its ruling, it also based its finding of unfitness here on Father's consistent negative comments to and about his son. K.S.A. 2014 Supp. 38-2202(y) defines "[p]hysical, mental or emotional abuse" as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered."

While there was testimony about the various comments Father made to or about R.W. that could be construed as negative, both Williams and Scott-Teigen testified that Father always spoke to R.W. in a loving tone. Williams felt that these comments could harm even a small baby, whereas Scott-Teigen disagreed. The district court obviously felt that these remarks fit into an overall pattern of lack of sensitivity and attunement to the child's basic environment.

In summary, there was highly conflicting evidence presented to the district court regarding Father's inability or unwillingness to learn and educate himself on the proper and safe care for his son and whether he made negative comments to or about his son. Our task on appeal is to determine whether, viewed in the light most favorable to the State, a rational factfinder could have found the determination to be highly probable.

In considering this issue, as well as all other issues presented to the district court, we must be mindful that it is in the best position to make credibility determinations, and an appellate court must not reweigh the evidence, substitute its evaluation of the evidence for that of the district court, or pass upon the credibility of the witnesses. *In re J.D.C.*, 284 Kan. 155, Syl. ¶ 8, 159 P.3d 974 (2007).

But even applying this relatively deferential standard, we are unable to conclude that the evidence and conclusions of the district court rise to the level of clear and convincing evidence such that a rational factfinder would find a high probability of "emotional or physical neglect" as defined by our laws.

While the district court was clearly frustrated by the actions of the Father, we find that the court's concerns more accurately relate to the other statutory factors which may provide grounds for termination of parental rights, and which we will now consider.

*K.S.A. 2014 Supp. 38-2269(b)(7)*

K.S.A. 2014 Supp. 38-2269(b)(7) allows for a finding of parental unfitness due to "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

The district court found Father unfit under this factor, citing "the failure of the numerous, significant and long-term reasonable efforts undertaken by KVC to rehabilitate and reunite [Father] with his son over the course of almost two years."

Father seems to assert that the district court erred by finding that there was a failure to rehabilitate his family. He notes that he complied with every request made by the case manager, and her continued dissatisfaction was unreasonable. He also points out

that his visitation with R.W. was interrupted based on unfounded allegations made by the foster parents that were actively seeking to adopt R.W.

The State counters that it provided Father with child attunement therapy, individual therapy, and meal planning classes, yet Father was unable to reintegrate with R.W., continued to speak negatively to R.W., continued to have issues providing R.W. with proper nutrition, continued to have issues with R.W.'s health, and continued to place R.W. in dangerous situations.

After hearing the evidence presented at the termination hearing, the district court strongly relied on the case manager's opinion that, given Father's current mental health state, his lack of participation in individual services as well as his lack of ability to provide substantial change in his parenting and his ability to understand R.W.'s continuing developmental and nutritional needs, it was not in R.W.'s best interests to reintegrate with Father. The court also gave significant weight to the case manager's concern about Father's refusal to sign a release for his records at Osawatomie State Hospital, a psychiatric facility where he had received treatment. The court also noted the case manager's concerns about Father's honesty and the conflicting stories he gave about where he was actually living.

In summarizing the history of the case, the district court observed that supervised visitation with Father had transitioned in stages from supervised visits, to monitored visits, and then to unsupervised visits, including overnight stays. But then, after concerns arose that R.W. was returning from extended overnights with Father with bumps and bruises and other health concerns (such as thrush), supervised visitation was reinstated. This regression was clearly reflected in the court's findings that Father had made little to no progress over the 2-year pendency of the case. The court was particularly concerned that Father denied these health issues existed, contended he did not know about them, or blamed the foster parents for allegedly lying about them. The district court also expressed

major concerns about Father's mental health status, including his lack of involvement with individual services and his unwillingness to allow caseworkers to have access to his mental illness hospital records. Finally, the court indicated it shared Williams' concerns that Father was not treating his son in an age-appropriate manner, such as insisting on feeding him food for crawling babies instead of food for babies of R.W.'s age who had teeth.

Once again, there is considerable conflicting evidence about the specifics and interpretation of each separate event described in a 4-day termination hearing covering literally hundreds of disputed events. The district court obviously found the testimony of the case manager, who had been working with Father and R.W. over a 2-year period, to be highly credible. The court's comments also left little doubt that it found Father's attitude toward parenting R.W. to be lackadaisical and intermittently resistive to numerous facets of the case plan and the needs of R.W. Though not expressed in precisely these terms, the court was plainly perturbed by what it perceived as Father's continued obliviousness to the advice of court-designated workers on best practices for his son's well-being, particularly since R.W. was known by Father to be "medically fragile."

To reiterate, we are in a position where the evidence before the district court cannot be reweighed and the conclusions of the court as to the facts must be accepted if they are supported by the record. Here, the court put great stock in the testimony of the case manager who had monitored the case virtually since the CINC action began. The court was very skeptical about much of Father's testimony. The court found a violation of K.S.A. 2012 Supp. 38-2269(b)(7) based upon "the failure of the numerous, significant and long-term reasonable efforts undertaken by KVC to rehabilitate and reunite [Father] with his son over the course of almost two years."

18

Having examined the record in detail, and considering the evidence in the light most favorable to the State, we are convinced that a rational factfinder would find the determination to be highly probable.

*K.S.A. 2014 Supp. 38-2269(b)(8)*

K.S.A. 2014 Supp. 38-2269(b)(8) allows for a finding of parental unfitness due to "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

The district court judge found Father unfit under this factor, stating,

"[Father] could not demonstrate a consistent ability to care for the physical or emotional needs of his son. He was neglectful of his son's emotional needs by his use of words and phrases which were hurtful. He was neglectful of his son's nutritional and physical needs. [Father] has had more than two years to adjust his circumstances and conduct to meets the needs of his son, and he has been unable to show or prove to this Court that he can now or ever be able to do so, or that he has the ability to do so."

Father asserts that his substantial efforts, already discussed above, and the changes in his conduct based on the therapy and classes that he took demonstrate that he made a good faith effort to adjust his circumstances, conduct, and conditions to meet R.W.'s needs.

The State makes the same argument that it made above, noting that Father continued to have the same issues throughout this case. It also asserts that Father failed to attend individual therapy while acknowledging that Scott-Teigen testified otherwise. The State also points out that Father refused to sign a release for records from Osawatomie State Hospital, and he continued to believe that the foster parents, R.W.'s maternal grandmother, and the State were conspiring to take R.W. away from him.

The district court's findings on this point focus again on Father's neglect, in terms of R.W.'s emotional, physical, and nutritional needs. Its findings, quite frankly, more directly fall under the first unfitness factor it found relating to emotional and physical neglect. Although we rejected the court's finding as unsupported by clear and convincing evidence on the first point, there does seem to be sufficient overlap between the statutory factors to allow the same evidence to be considered by the court under K.S.A. 2014 Supp. 38-2269(b)(8).

By its clear language, this unfitness factor concerns a lack of effort by the parent to adjust in order to meet the needs of the child. Our analysis here is similar to that of the previous factor relating to social agency failure to rehabilitate the family under K.S.A. 2014 Supp. 38-2269(b)(7).

The district court focused in on a lack of consistency and substantial backsliding by Father on case plan goals over the nearly 2 years when case plans were in place and ordered by the court. The court commented that Father's ongoing "use of words and phrases which were hurtful" continued over the course of the case. Likewise the court was greatly troubled by what it regarded as Father being "neglectful of his son's nutritional and physical needs."

While we were not satisfied that these same concerns met the standard of being clear and convincing evidence of neglect under K.S.A. 2014 Supp. 38-2269(b)(4), we believe they do rise to that level under this factor. Specifically, we note there is evidence in the record from Williams that, even after 2 years of parenting instruction, Father was still not feeding R.W. adequate amounts of food or providing age-appropriate food. Additionally, there was testimony that Father continually either minimized or was in a state of denial about bruises, scratches, and other childhood medical conditions needing attention which arose while R.W. was in his unsupervised care.

The district court's findings here obviously echo its reliance on Williams' testimony as to the adequacy of Father's efforts to adjust to the needs of R.W. The court obviously discounted the testimony of Father as to many of the multitude of events covered at the termination hearing. It is once again obvious that the court found that the cumulative nature of all of these events painted a picture where Father simply was not willing or able to change his parenting ways to respond to the unique needs of R.W.

Given the district court's heavy reliance on the testimony of Williams, which we are not free to discard or discount, we find clear and convincing evidence to support the court's findings on this factor.

*K.S.A. 2014 Supp. 38-2269(c)(3)*

K.S.A. 2014 Supp. 38-2269(c)(3) allows for a finding of parental unfitness when the child is not in the physical custody of a parent due to "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

The district court found Father unfit under this factor, determining that Father had failed to complete a reintegration plan and had failed to demonstrate that he was able to incorporate "the things he was supposed to have learned into any type of proof that he could appropriately and adequately parent his son. [Father] blames everyone else for the position in which he finds himself."

Father asserts that Williams' testimony showed that he did complete every task assigned to him on the reintegration plan and even voluntarily attended additional child attunement therapy for the benefit of R.W. He also maintains that he showed his ability to incorporate what he had learned through the changes he made feeding his son and through his continued care for his son.

21

The State simply points out that Williams testified that Father did not complete the reintegration plan, which required him to utilize appropriate parenting skills.

Based on the analysis of the other unfitness factors above, this unfitness factor is also supported in the record. Williams testified that Father had not completed the reintegration plan, largely because she felt that Father's parenting skills had not appreciably changed over the course of this case. The district court found this evidence highly credible and discounted Father's complaints about unfair treatment by Williams. Once again, considering this evidence in the light most favorable to the State, we find clear and convincing evidence to support the factor.

*Was Father's unfitness unlikely to change in the foreseeable future?*

The district court determined that Father's conditions of unfitness were unlikely to change in the immediate or foreseeable future because the concerns about Father from the beginning of the case had not changed or improved. It felt that Father had not demonstrated that he could be "an active, learned or an appropriate parent" and that Father's age and experience raising children in the absence of a demonstrated ability to appropriately parent a young child only underscored that Father's unfitness was unlikely to change in the foreseeable future.

Father argues that he has demonstrated that he is not unfit, and he maintains that he continues to learn new ways to care for R.W. He aims to be a better parent to R.W. than he was to his grown children. He points out that although the district court did not believe Father had shown any progress, Scott-Teigen and Williams both testified that he had progressed.

The State asserts that Father had nearly 2 years to change his ways, yet he continued to talk negatively to R.W., continued to have problems providing for R.W.

22

nutritionally and medically, and continued to place R.W. in dangerous situations. In short, it feels that the record demonstrates that Father will not be able to change in the foreseeable future if he was unable to change during those 2 years.

There is some evidence in the record that Father's parenting skills had marginally improved in some respects during the 2-year period between the filing of the original petition and the termination hearing. He rectified his housing problem and outfitted his home to care for R.W. He completed child attunement therapy and curbed the number of times he made comments to R.W. that Williams felt were negative. He attended nutrition classes and began feeding R.W. more appropriate foods. He got involved in R.W.'s healthcare and demonstrated an ability to attend to those healthcare concerns and seek guidance when he had questions.

The district court was persuaded by Williams' testimony that she still had concerns about Father's parenting skills, and his ability to care for R.W. In making its holdings, the court held as follows:

"The Court finds and concludes that these conditions of unfitness of [Father] are unlikely to change in the immediate or foreseeable future. Concerns about [Father] raised from the very beginning of the case have neither changed nor improved. Concerns were raised at the evidentiary hearing on the State's request for temporary custody. The Court noted similar concerns in its January 2013 ruling. There were concerns raised at the CINC trial, and the Court noted its own concerns at its ruling in May 2013. [Father] was offered a four-month reintegration plan that started May 17, 2013. That plan ended on September 17, 2013 and was never formally extended by the Court. [Father] had the opportunity to work on his tasks even up to the date the termination trial formally began. He has never demonstrated to KVC or to this Court that he can be an active, learned or an appropriate parent. In fact, little has changed or improved on [Father's] part since the inception of the case. There is still no discernable improvement in parenting or in engagement. Notably, for an individual of [Father's] age who claimed to have raised three biological children and three stepchildren (all of whom are now adults) who now should

23

clearly be able to demonstrate that he is and has been an experienced, learned parent with the demonstrated ability to parent a young child such as [R.W.], only underscores this Court's conclusion that [Father's] conditions of unfitness are unlikely to change or improve in the immediate or foreseeable future.

"[R.W.] has been in the temporary custody of the State for virtually his entire life. He deserves permanency. His mother has no interest in him or in reintegrating with him. [Father] got a reintegration plan and has had almost two years to demonstrate an ability to parent, but in fact has never been able to demonstrate that he is able to safely, appropriately or adequately parent his son. [Father] has consistently shown throughout the course of the case that he cannot adequately or appropriately parent his son. He never made the changes necessary to put himself in a position to have his child reintegrated into his home. He has not gained the insight or skills necessary to show this Court or the social workers associated with his son's case that [R.W.] can be entrusted to him. There is no evidence to show an overall change in [Father's] ability to recognize and change safety concerns both within the community and within his home, appropriate nutrition, appropriate development for a child or to be able to respond to those things appropriately."

Though we note that the record may not be as totally bereft of progress by the Father as bemoaned by the district court, we believe the lens which must be used to view this issue, the perspective of the child, compels us to accept the court's conclusions.

Each child comes into the world in unique circumstances, but the condition of some children presents a need for more attention and sacrifice on the part of parents than may be typical. In this case, because of R.W.'s prenatal and birth circumstances, it is undisputed that he is a "medically fragile" child. This was well known to all parties, including Mother, Father, social services agency workers, and the foster parents.

We believe a parent's standard of care, like any other standard of care, should be based on what a reasonable person would do under the same or similar circumstances. When measured by this criterion, we agree with the district court that Father's level of

care for R.W., as measured over the 2-year period of case planning here, was simply inadequate in light of the medical fragility of R.W.

Virtually the entire scope of R.W.'s life has been under the overall aegis and direction of the district court. Given the age of the Father (approximately 60) and his professed experience in raising several other children, the district court had every right to expect him to understand the need for great attentiveness to and compliance with the court-ordered case plans, in order to set a healthy pattern for an endangered child during critically formative years.

No law compels parents to practice absolutely ideal parenting practices. But when, as here, a child is found to be a child in need of care (and which finding was not appealed by any party), public policy requires that failure to abide by certain minimum standards of parenting may result in adverse action concerning the rights of those parents to continue parenting. And the law specifies that those child-specific standards be adopted by the court as "case plans" to give the parents notice of the district court's expectations and provide the court with measurable milestones to gauge parental movement toward restoration of full parental rights (*i.e.*, reintegration). If the court finds clear and convincing evidence of failure under any one or more of the statutory criteria for termination, those parental rights are subject to termination.

In this case, the district court found clear and convincing evidence of Father's failure in four separate areas, as noted above. We have found the findings to be inadequate as they pertain to the issue of emotional or physical neglect, based upon our reading of the statutory definition of neglect. But we have found that a rational factfinder could agree with the court as to the other three factors.

Unlike a child in his or her mid-to-late teen years, a newborn child or toddler is in need of constant and vigilant attention. From the "child's perspective" there is 100 percent

reliance on a responsible adult to provide this nurture and attention. Particularly in the case of an older adult whose parenting skills may have been learned in past years where less knowledge of child developmental needs was extant, we do not find it unreasonable to require a parent to give heightened attention to case plan tasks and the reasonable requests of child care workers operating under court orders.

While each of the dozens of individual points of conflict brought out at the termination hearing between Father and the caseworkers carrying out the district court's orders can be microanalyzed and dissected to argue each party's points, we believe an overall view of Father's actions in this case reveals a 2-year cumulative pattern of unwillingness or inability to make the major lifestyle changes necessary for R.W.'s well-being. And given the court's obvious conclusion that this longitudinal problem has not varied in any significant way from the very start of this case, we agree that it is unlikely that major changes will occur as Father advances into his mid-to-late 60's, which represent R.W.'s foreseeable future.

In short, R.W. has been waiting for 2 years for his Father to substantially complete what was admittedly a difficult and daunting task of case plan compliance which was set before him by the district court. Sadly, that has not occurred in ways which truly embraced the unique needs of R.W. Because of this, we must affirm the court's finding that this situation is not likely to change in the foreseeable future.

Affirmed.